UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ANDRE C.T. WELLS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:20-cv-03086-TWP-MG |
| | ) |
| WEXFORD OF INDIANA LLC, | ) |
| | ) |
| Defendant. | ) |

**ORDER DENYING MOTION TO RECONSIDER SUMMARY JUDGMENT,
GRANTING WEXFORD'S MOTION FOR SUMMARY JUDGMENT,
AND DIRECTING ENTRY OF FINAL JUDGMENT**

This matter is before the Court on a Motion for Summary Judgment filed by Defendant Wexford of Indiana, LLC ("Wexford") (Dkt. 51), and Plaintiff Andre C.T. Wells' ("Mr. Wells") Motion to Reconsider Summary Judgment as to former defendant Dushan Zatecky ("Warden Zatecky") (Dkt. 75). Mr. Wells, an inmate at Pendleton Correctional Facility ("Pendleton"), filed this civil rights action under 42 U.S.C. § 1983 alleging that (1) Warden Zatecky was deliberately indifferent to his health and retaliated against him for filing grievances, and (2) Wexford was deliberately indifferent to his exposure to COVID-19 and violence from other inmates by failing to implement adequate policies in light of the novel coronavirus.

Warden Zatecky moved for summary judgment against Mr. Wells arguing that he failed to exhaust administrative remedies before bringing claims against him. (Dkt. 25). Summary judgment was granted on behalf of Warden Zatecky November 30, 2021. (Dkt. 45.) On May 23, 2022, Mr. Wells filed a motion for reconsideration of that ruling which is before the Court. (Dkt. 75.) Wexford has moved for summary judgment on the claims pending against it, arguing that Mr. Wells cannot show that his rights were violated due to a Wexford policy or practice. (Dkt. 51.)

For the reasons explained below, Mr. Wells' Motion to Reconsider entry of summary judgment in Warden Zatecky's favor, is **denied**, and Wexford's Motion for Summary Judgment, is **granted**.

## I. LEGAL STANDARDS

### A. Motion to Reconsider

"Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Caisse Nationale De Credit Agricole v. CBI Indus.*, 90 F.3d 1264, 1269 (7th Cir. 1996) (internal quotations and citations omitted). A motion to reconsider is not an occasion to make new arguments, *In re Prince*, 85 F.3d 314, 324 (7th Cir. 1996), nor is it "an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion," *Caisse*, 90 F.3d at 1269-70; *see also Dominguez v. Lynch*, 612 F. App'x 388, 390 (7th Cir. 2015) ("Motions to reconsider 'are not replays of the main event.'") (quoting *Khan v. Holder*, 766 F.3d 689, 696 (7th Cir. 2014)).

### B. Summary Judgment Standard

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Comm. Schs.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v.*

*Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder.  *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

## II.   DISCUSSION

The Court will first discuss Mr. Wells Motion to Reconsider Order Granting Summary Judgment for failure to exhaust, before turning o Wexford's Motion to for Summary Judgment.

**A.   Motion to Reconsider**

Mr. Wells submits his Motion to Reconsider under Rule 59(e) of the Federal Rules of Civil Procedure, *see* Dkt. 75 at 1, but a Rule 59(e) motion "can only follow a 'judgment.'" *Galvan v. Norberg*, 678 F.3d 581, 587 n.3 (7th Cir. 2012).  No judgment has issued yet in this action.  Nonetheless, the district court has the authority to reconsider its orders at any time prior to final judgment.  *See id.* ("Rule 54(b) governs non-final orders and permits revision at any time prior to the entry of judgment, thereby bestowing sweeping authority upon the district court to reconsider….").

The Court previously concluded that Mr. Wells failed to exhaust available administrative remedies as to his Eighth Amendment claims because he failed to properly follow the procedure for obtaining permission to submit a grievance appeal late.[1]  (Dkt. 45 at 6−7.)  In his Motion to Reconsider, he argues that the COVID-19 pandemic, related lockdowns, and limited law library access inhibited his ability to craft a response in opposition to Mr. Zatecky's summary judgment motion to show that administrative remedies were unavailable.  (Dkt. 75 at 9.)  He then argues that Mr. Zatecky's control over Mr. Wells' movement throughout the prison and the grievance

---

[1] Mr. Wells does not challenge the Court's ruling as it relates to his retaliation claims.  (Dkt. 75 at 13.)

counselor's efforts to thwart his ability to file a grievance prevented him from completing the grievance process in a timely manner. *Id.* at 10–12.

Mr. Wells cannot raise new arguments in a motion to reconsider, *In re Prince*, 85 F.3d at 324, and his arguments "could and should have been made" before the Court ruled on the motion for summary judgment, *Cehovic-Dixneauf v. Wong*, 895 F.3d 927, 932 (7th Cir. 2018). Although the Court understands that incarcerated litigants have limited access to the law library—especially during an ongoing pandemic—Mr. Wells sought (and received) only one extension of time to prepare his response. (Dkts. 29, 31.) He has not shown that he could not file additional motions for time while the summary judgment motion was pending. Because Mr. Wells has not shown a manifest error of law or fact, his Motion to Reconsider, (Dkt. 75), is **denied**.

**B.     Wexford's Motion For Summary Judgment**

**1.     Motion to Strike Plaintiff's Dispositive Motion Designations as Untimely**

As a preliminary matter, the Court addresses Wexford's motion to strike some of Mr. Wells' designated exhibits in his response to the Motion for Summary Judgment as untimely. (Dkt. 76.) The discovery deadline in this case was December 23, 2021. (Dkt. 23.) Wexford served its first set of requests for production and first set of interrogatories on November 11, 2021. (Dkt. 43.) In that request, Wexford asked Mr. Wells to disclose statements of individuals familiar with the facts alleged in the Complaint, and any documents with facts or opinions of people familiar with facts alleged in the case. (Dkt. 76 at ¶ 4.)

On February 23, 2022, Wexford moved for summary judgment. (Dkt. 51.) The Court extended Mr. Wells' deadline to respond to the motion several times, and also permitted Mr. Wells to serve discovery requests related to guidelines set forth by the Centers for Disease Control and

Prevention ("CDC") referred to in Wexford's Motion for Summary Judgment. (Dkts. 57 at 3, 63, 66.)

On May 6, 2022, Mr. Wells filed a discovery disclosure adding thirteen previously undisclosed witnesses: Jansen Hamlett, Douglas Reaves, Aaron A. Staton, Phillip Garret, Corey A. Greenlee, Terrance Thomas, Spiros Alatorre, Adrian Edwards, Aaron Windom, Adrian Reed, Nicholas LaCruze, Marvel Harper, and Quanardel Wells. (Dkt. 71.) Wexford moves to strike the witnesses and any statement of fact dependent on the witnesses. Wexford also moves to strike Exhibits D−J, consisting of affidavits from witnesses Reaves, Staton, Garret, Greenlee, Alatorre, Quanardel Wells, and Thomas.

Federal Rule of Civil Procedure 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." Mr. Wells' belated disclosures are not harmless. The affidavits raise substantive issues outside the timeframe of Mr. Wells' claims and, even where the facts relate to his claims, Wexford was deprived of the opportunity to depose these witnesses before filing its summary judgment motion.

Mr. Wells argues in opposition to the motion that he was unaware that these inmates possessed relevant information because the prison had implemented "control movement" which prevented inmates from interacting with one another. (Dkt. 78 at 3−5.) But "case management depends on enforceable deadlines, and discovery 'must have an end point.'" *Flint v. City of Belvidere*, 791 F.3d 764, 768 (7th Cir. 2015) (quoting *Stevo v. Frasor*, 662 F.3d 880, 886 (7th Cir. 2011)). Discovery closed in this case in December 2021, and Mr. Wells did not disclose these witnesses until May 2022. Further, he did not ask for leave to disclose them late. Because this

late disclosure is unfairly prejudicial to Wexford, the Motion to Strike is **granted**. **The Clerk is directed** to strike Exhibits D−J, consisting of affidavits from witnesses Reaves, Staton, Garret, Greenlee, Alatorre, Quanardel Wells, and Thomas, from the record.

2. **Factual Background**

Mr. Wells is currently incarcerated at Pendleton. Wexford was the medical care provider for Indiana Department of Correction ("IDOC") inmates at all times relevant to Mr. Wells' Complaint. Mr. Wells is suing Wexford because he believes that their failure to promulgate appropriate policies exposed him to COVID-19, and for their riotous behavior in April 2020. (Dkt. 1, Dkt. 53-4 at 5 (15:9−12).)

The IDOC implemented its Preparedness and Response Plan ("COVID-19 Response Plan") regarding the COVID-19 pandemic on March 3, 2020.[2] (Dkt. 88-1 at ¶ 5; Dkt. 88-2.) IDOC collaborated with Wexford to create the protocol. (Dkt. 53-3; Dkt. 88-1 at ¶ 3.) The purpose of creating the COVID-19 Response Plan was to implement a plan that would assist in the management of infectious diseases within IDOC facilities through prevention, testing, appropriate treatment, education, and infection control measures. (Dkt. 88-1 at ¶ 5.) One of the primary objectives of the COVID-19 Response Plan was to prevent the spread of illness by "quickly identify[ing] infected individuals and interrupt[ing] the transmission" of the virus. (Dkt. 88-2 at 2.) Wexford ensured that the directives of the COVID-19 Response Plan were implemented across all IDOC facilities. (Dkt. 88-1 at ¶ 5.) During conference calls, all Wexford clinicians were

---

[2] Wexford initially introduced as an exhibit the "IDOC & Wexford COVID-19 Protocol" in support of its motion for summary judgment. (Dkt. 53-3.) The Court ordered Wexford to supplement its evidence because there was no date indicating when this protocol was implemented. (Dkt. 87.) In response, Wexford produced the COVID-19 Response Plan. (Dkt. 88-2.) Dr. Michael Mitcheff, at all relevant times Wexford's Regional Medical Director for Indiana, explained that the evidence provided before consisted of portions of the COVID-19 Response Plan that were summarized on IDOC's website. (Dkt. 88-1 at ¶¶ 1, 3.) The Court will mostly cite to IDOC's COVID-19 Response Plan because it is more detailed, especially with respect to Mr. Wells' claim. Mr. Wells challenges the authenticity of Wexford's supplemental exhibit. (Dkt. 92 at ¶ 2.) This objection is not well taken because Mr. Wells had previously submitted the COVID-19 Response Plan as an exhibit. (Dkt. 70 at 3−10.)

advised to follow the recommendations of the CDC for treatment of COVID-19 within the correctional setting. *Id.* at ¶ 4.

Part of the COVID-19 Response Plan dealt with "illness management procedures", *i.e.*, what to do when inmates became sick. (Dkt. 88-2 at 3−4.) The procedure for managing sick inmates was created pursuant to CDC guidelines and Indiana State Health Department recommendations. *Id.* at 9. These procedures include:

- Monitoring for disease outbreaks;
- Separation of ill offenders;
- Implementing social distancing when a few offenders are ill;
- Isolation housing units when a substantial number of offenders are ill[.]

*Id.* at 4. If an individual exposed to the virus arrived at the facility, he was to be placed in quarantine in a single-person cell and separated from activities for the duration of the incubation period. *Id.* at 9. If there was an outbreak at the housing unit level, however, the inmates would be quarantined "in a unit with restriction of movement to within the housing unit" with meals delivered to the unit and the inmates being separated from group activity until the end of the incubation period. *Id*.

The COVID-19 Response Plan also addressed issues related to cleaning the facilities, having supplies such as hand sanitizer available to inmates and staff, special procedures related to sick call, and screening and limiting non-essential visitors. *Id.* at 3−10.

In April 2020, Mr. Wells was living in an open dorm in the K5 unit. Dkt. 53-4 at 5 (16:23−24). On April 11, 2020, he had a nurse visit where his temperature check was normal. Sometime between April 14 and 16, 2020, Mr. Wells and approximately 50 other inmates were moved to a gym after they registered a temperature over 100 on a digital thermometer. *Id.* at 5 (17:4−11). Mr. Wells believes the thermometer was broken, because neither he nor the other

inmates felt feverish or had other symptoms. *Id.* at 5 (17:16−21). He overheard some of the nurses state that "they knew that this device was broken or wasn't giving a proper reading." *Id.* at 6 (18:1−3). Mr. Wells did not want to go to the gym and be exposed to sick inmates if he was not sick. *Id.* at 6 (18:17−24).

In the gym, the inmates were told that they were there because they were symptomatic for COVID-19, and they should choose a cot to sleep on. *Id.* at 6 (19:7−12). The inmates received COVID-19 tests, and Mr. Wells' test results, received the next day, were negative. *Id.* at 6 (19:17−20).

After testing the inmates, staff brought in an inmate who had recovered from the virus. *Id.* at 6 (20:1-5). The inmates in the gym "panicked and said, Get him out of here. Everyone was freaking out." *Id.* at 6 (20:7−8). The administration agreed and said they would not put anyone else in the gym known to have the virus because the inmates in the gym were a "control group." *Id.* at 6 (20:9−11). As Mr. Wells understood the control group, prison staff were trying to determine who did and who did not have COVID-19 in order to determine appropriate housing. *Id.* at 6 (21:1−6).

However, the following day prison staff introduced a COVID-19-positive inmate to the gym, and a riot ensued. *Id.* at 6 (20:21−23). Mr. Wells "was just in shock" when the scene turned violent, because IDOC custody staff and inmates had been "calm and talking" about the situation, but one of the inmates became aggravated and the scene quickly became tense. *Id.* at 6−7 (21:8−12; 23:3−11). The inmates assaulted several correctional officers, and the officers deployed pepper spray to subdue the inmates. *Id.* at 6−7 (21−23). Mr. Wells was not injured during the incident, but he found it upsetting and requested to meet with mental health staff. *Id.* at 7 (23:12−22). Mr. Wells was not seen by mental health staff because they were too busy and

understaffed. *Id.* at 7 (24:11–15). Mr. Wells did see a nurse on April 17, 2020 for mild wrist pain from having been zip-tied during the riot, but he did not express other medical concerns at the visit. (Dkt. 53-1 at 2; Dkt. 53-4 at 8 (27:1–9).)

Approximately one week later, Mr. Wells began experiencing symptoms that he believed were consistent with COVID-19, including difficulty breathing, dry cracked feet, headaches, and a loss of taste and smell. (Dkt. 53-4 at 8 (28:10–24).) Mr. Wells did not submit a healthcare request form for treatment because by that time he was isolating in a cell and did not want to be sent back to the gym. *Id.* at 8 (29:9–16). Mr. Wells did not inform any medical staff of his suspected COVID-19 case until he filed this lawsuit. *Id.* at 9 (31:9–18). Mr. Wells has never been diagnosed with COVID-19. *Id.* at 9 (31:20–24). At the time of his deposition, Mr. Wells had not regained his sense of smell but had otherwise recovered. *Id.* at 5 (14:17–18).

Mr. Wells believes that Wexford should have had standards of procedure for handling the virus, and that placing inmates who may or may not have COVID-19 in the gym resulted in his exposure to the virus and to violence by inmates who were upset by the housing decision. *Id.* at 5 (15:9–18); Dkt. 1 at 6. He admitted that he is not aware of a specific Wexford policy regarding his allegations. (Dkt. 53-4 at 5 (15:22–23).)

   3.   **Relevant Law**

         a.   **Eighth Amendment Conditions of Confinement**

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Helling v. McKinney*, 509 U.S. 31 (1993)). The Eighth Amendment's deliberate indifference framework includes an objective prong and subjective prong. *Id.* at 834. To prove the objective prong, Mr. Wells must show that placing inmates with unknown COVID-19 status in

9

close quarters in a gym placed him in "substantial risk of serious harm" to his health or safety. For the subjective prong, he must show that the Defendants knew of and disregarded an excessive risk of harm to Mr. Wells' health or safety. *Id.* at 837.

### b. Municipal Liability

Mr. Wells' Eighth Amendment claim against Wexford may only proceed under *Monell v. Dept. of Social* Services, 436 U.S. 658 (1978); *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (noting that private corporations acting under color of state law— including those that contract with the state to provide essential services to incarcerated people— are treated as municipalities for purposes of Section 1983). "The critical question under *Monell* is whether a policy or custom of a municipal entity caused a constitutional deprivation." *Gonzalez v. McHenry Co., Ill.*, 40 F.4th 824, 829 (7th Cir. 2022).

To prevail on a claim against Wexford, Mr. Wells must first show that he was deprived of a federal right, and then he must show that the deprivation was caused by a Wexford custom or policy or failure to implement a needed policy. *Id*. In other words, "*Monell* liability only attaches if the policy, custom or practice, or decision was the moving force behind the federal rights violation." *Gonzalez*, 40 F.4th at 829 (internal citations omitted). Wexford cannot be liable under the theory of *respondeat superior* for the actions of its employees. *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021).

### 4. Analysis

In its Screening Order, the Court framed Mr. Wells' claim as a conditions of confinement claim. (Dkt. 8 at 3.) Wexford has framed the claim as deliberate indifference to a serious medical need. (Dkt. 52 at 6−8.) Those two standards are related, but Wexford's analysis focuses on whether Mr. Wells was diagnosed with COVID-19 and received adequate treatment and only

10

briefly discusses whether Wexford promulgated a policy to prevent exposure to COVID-19. *See id.* at 12. Rather than focusing on his medical care, the question here is whether Mr. Wells has shown that the conditions of his confinement subjected him to a serious risk of harm to his health and safety. Even though Mr. Wells was never diagnosed with COVID-19, the Court assumes for purposes of this Motion that he contracted the virus based on his reported symptoms.

A jury could find that placing Mr. Wells in close quarters in a gym with a group of inmates who were not confirmed to have COVID-19 but were symptomatic[3] posed a substantial risk of harm to Mr. Wells' health, satisfying the objective prong of the deliberate indifference analysis. *Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020) (finding that the transmissibility of COVID-19 combined with a prison's dormitory-style housing presented a substantial risk that prisoners "will be infected with COVID-19 and have serious health effects as a result[.]").

But Mr. Wells has not shown that Wexford's response to the COVID-19 pandemic was deliberately indifferent to a serious risk of harm to his health or safety. *Id.* In assessing the subjective prong, the question is whether the defendant "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. The COVID-19 Response Plan was implemented by IDOC in March 2020 to combat the spread of the virus. (Dkt. 88-2.) Wexford collaborated with IDOC to create the COVID-19 Response Plan and directed its employees to comply with it. (Dkt. 53-2 at ¶ 10, Dkt. 88-1 at ¶ 5.) Placing inmates who were suspected of having COVID-19 together in the gym was consistent with the COVID-19 Response Plan.

---

[3] Although Mr. Wells alleges that the thermometer was broken and he did not have a fever, he testified that the thermometer recorded his temperature as over 100 and that the staff moved him and other inmates "because they believed that [they] were symptomatic." (Dkt. 53-4 at 6 (18:5−6; 19:11−12).) Thus, it appears the medical providers acted in good faith. But even if the Court assumed that the nurses knowingly used a defective thermometer and recklessly intermingled sick inmates with healthy ones, Wexford cannot be held liable under the theory of *respondeat superior* for the actions of its employees. *Howell*, 987 F.3d at 653.

(Dkt. 88-2 at 9.)  The reason these inmates were grouped together was to prevent the spread of the virus to other parts of the prison.  *Id.* at 2.  Although isolating inmates suspected of having the virus may have been preferrable, placing sick inmates in the gym as a group may have been necessary given the constraints of space within Pendleton.  *See Hope v. Warden York Co. Prison*, 972 F.3d 310, 330 (3rd Cir. 2020) (citing CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, which provided that social-distancing "strategies will need to be tailored to the individual space in the facility and the needs of the residents and staff.").[4]

Additionally, the COVID-19 Response Plan provided that inmates and staff be provided hand sanitizer, that common areas be cleaned on a regular basis, and that visitation be limited to prevent the spread of illness.  (Dkt. 88-2 at 8−13.)  The COVID-19 Response Plan reflects that the IDOC and Wexford took reasonable measures to prevent inmates and staff from becoming infected with COVID-19.  No juror could find that they disregarded a risk of harm when they implemented this protocol, even if Mr. Wells ultimately became ill with COVID-19 after being quarantined in the gym. *See Hope*, 972 F.3d at 330 (concluding that, in the context of immigration detention, the government's failure to eliminate all risk of exposure to COVID-19 did not constitute deliberate indifference where facility administrators took steps to isolate and quarantine sick detainees and ramp up cleaning measures); *Wilson*, 961 F.3d at 841 (finding Bureau of Prisons reasonably responded to the risk of COVID-19 by implementing measures similar to those here).

Further, any claim that Wexford was deliberately indifferent to the risk of a riot resulting

---

[4] CDC guidance in that respect remains the same. *See* CDC, *Guidance on Prevention and Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, updated May 3, 2022, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html . The Court cites to *Hope* because there the court had visited the CDC's website as of August 2020, which is closer in time to the incident at issue in this case.

from the quarantine policy must fail. "To be found liable under the Eighth Amendment, a prison official 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (quoting *Farmer*, 511 U.S. at 837). There is no evidence that Pendleton or Wexford staff were aware that the inmates would riot when they were placed in the gym. Mr. Wells himself stated that he was shocked when the riot occurred because inmates and staff had been calmly talking about moving additional inmates into the gym when the fight broke out. (Dkt. 53-4 at 6−7 (21−22).)

In short, the undisputed evidence shows that Wexford, in collaboration with IDOC, created and implemented a COVID-19 Response Plan to prevent the spread of COVID-19 and care for infected inmates. No jury could conclude that Wexford was deliberately indifferent to Mr. Wells' health and safety, even if the risk of contracting COVID-19 was not ultimately averted. As a result, Wexford's Motion for Summary Judgment is **granted**.

### III.   CONCLUSION

For the foregoing reasons, Mr. Wells' Motion to Reconsider Summary Judgment in favor of former Defendant Dushan Zatecky, Dkt. [75], is **DENIED**. Wexford's Motion to Strike Plaintiff's Dispositive Motion response and designation of evidence, Dkt. [76], is **GRANTED to the extent** that the Court did not consider Exhibits D−J, consisting of affidavits from witnesses Reaves, Staton, Garret, Greenlee, Alatorre, Quanardel Wells, and Thomas, and the **Clerk is directed** to strike these exhibits from the record. *See* Dkt. 70 at 13−21.

Because Mr. Wells has not shown that the COVID-19 Response Plan demonstrated deliberate indifference to his risk of exposure to COVID-19, Wexford's Motion for Summary Judgment, Dkt. [51], is **GRANTED**.

Final judgment consistent with this Order, the Court's February 19, 2021 Screening Order, and the Court's November 30, 2021 Order granting summary judgment in favor of Defendant Dushan Zatecky (Dkt. 45), shall now issue.

**SO ORDERED.**

Date: 9/20/2022

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Andre C.T. Wells, #196966
PENDLETON CORRECTIONAL FACILITY
Inmate Mail/Parcels
4490 West Reformatory Road
Pendleton, Indiana  46064

Douglass R. Bitner
STOLL KEENON OGDEN PLLC
doug.bitner@skofirm.com

Rachel D. Johnson
STOLL KEENON OGDEN PLLC
rachel.johnson@skofirm.com